IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOHN MALONE,
      Petitioner,

vs.                                 Case No.: 3:06cv231/MCR/EMT

JAMES R. McDONOUGH,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254 (Doc. 8). Respondent filed an answer and relevant portions of the state court record (Doc. 14). Petitioner filed a reply (Doc. 20).

      The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

## I.      BACKGROUND AND PROCEDURAL HISTORY

      The procedural background of this case is undisputed by the parties and established by the state court record. Following a jury trial in the Circuit Court for Escambia County, Florida, on February 17, 20, and 21, 2003, Petitioner was found guilty of one count of conspiracy to traffic 400 grams or more but less than 150 kilograms of cocaine, six counts of sale or delivery of cocaine or possession with intent to sell or deliver cocaine, and one count of possession of paraphernalia (Doc. 14, Exs. B at 217–19, C, D). He was sentenced on February 21, 2003, to thirty (30) years of

incarceration on the conspiracy charge, with a fifteen (15) year mandatory minimum and credit for 452 days of pre-sentence jail time, and six (6) concurrent terms of fifteen (15) years of incarceration on the sale, delivery, or possession with intent to sell charges, to run consecutive to the sentence on the conspiracy count, and time served on the possession of paraphernalia count (*id.*, Ex. B at 225–30).  Petitioner appealed his conviction and sentence to the Florida First District Court of Appeal (First DCA).  The appellate court affirmed the conviction and sentence per curiam without written opinion on January 26, 2004, with the mandate issuing February 11, 2004 (*id.*, Ex. G). Malone v. State, 865 So. 2d 485 (Fla. 1st DCA Jan. 26, 2004) (Table).

On December 3, 2004, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Doc. 14, Ex. H at 37–71).  The trial court denied the motion on April 13, 2005, without an evidentiary hearing (*id.* at 79–200).  Petitioner appealed the decision to the First DCA.  The appellate court affirmed the decision per curiam without written opinion on December 29, 2005, with the mandate issuing January 17, 2006 (*id.*, Ex. L).  Malone v. State, 918 So. 2d 295 (Fla. 1st DCA Dec. 29, 2005) (Table).

On March 31, 2006, Petitioner filed a petition for writ of habeas corpus with the First DCA alleging ineffective assistance of appellate counsel (Doc. 14, Ex. M).  The First DCA denied the petition per curiam on the merits on April 27, 2006.  Malone v. State, 930 So.2d 709 (Fla. 1st DCA Apr. 27, 2006).

Petitioner filed the instant habeas action on May 23, 2006 (Doc. 1 at 6).  Respondent concedes that the petition was timely filed (Doc. 14 at 4).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides, "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws of the United States."  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for federal habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19.

Section 2254 now provides:

(d)     An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to
any claim that was adjudicated on the merits in State court proceedings unless
the adjudication of the claim–

(1)     resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law, as
determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in the
State court proceeding.

28 U.S.C. § 2254 (West Supp. 2001).

The United States Supreme Court explained the framework of review under § 2254(d)(1) in

Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[1]  The appropriate test

in habeas cases was described by Justice O'Connor as follows:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court
to grant a state prisoner's application for a writ of habeas corpus with respect to
claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may
issue only if one of the following two conditions is satisfied—the state court
adjudication resulted in a decision that (1) "was contrary to . . . clearly established
Federal law, as determined by the Supreme Court of the United States," or (2)
"involved an unreasonable application of . . . clearly established Federal law, as
determined by the Supreme Court of the United States."  Under the "contrary to"
clause, a federal habeas court may grant the writ if the state court arrives at a
conclusion opposite to that reached by this court on a question of law or if the state
court decides a case differently than this Court has on a set of materially
indistinguishable facts.  Under the "unreasonable application" clause, a federal
habeas court may grant the writ if the state court identifies the correct governing
legal principle from this Court's decisions but unreasonably applies that principle to
the facts of the prisoner's case.

Id., 529 U.S. at 412–13; Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed.

2d 125 (2000).

The Eleventh Circuit has developed a three-step process for applying the Williams test to any

issue raised in a federal habeas petition upon which there has been an adjudication on the merits in

---

[1]Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the
Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529
U.S. at 367–75, 390–99, 120 S. Ct. at 1499–1503, 1511–16); and Justice O'Connor for the Court (joined by Justices
Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13, 120 S. Ct. at
1518–23).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

a formal state court proceeding.  *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260–61 (11th Cir. 2002); <u>Robinson v. Moore</u>, 300 F.3d 1320, 1343–45 (11th Cir. 2002).  First, the court must ascertain the controlling legal principles that are clearly established by the Supreme Court at the time of the state court adjudication.  <u>Wellington</u>, 314 F.3d at 1260; <u>Robinson</u>, 300 F.3d at 1343.  Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court law.  <u>Wellington</u>, 314 F.3d at 1260, <u>Robinson</u>, 300 F.3d at 1344.  "The 'contrary to' clause in § 2254(d)(1) 'suggests that the state court's decision must be substantially different' from the relevant Supreme Court precedent."  <u>Wellington</u>, 314 F.3d at 1260 (quoting <u>Fugate v. Head</u>, 261 F.3d 1206, 1216 (11th Cir. 2001), *cert. denied*, 535 U.S. 1104, 122 S. Ct. 2310, 152 L. Ed. 2d 1065 (2002)  (quoting <u>Williams</u>, 529 U.S. at 405)).  "Although a state court's decision that 'applies a rule that contradicts' the governing Supreme Court law is 'contrary,' a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  <u>Wellington</u>, 314 F.3d at 1260 (citing and quoting <u>Williams</u>, 529 U.S. at 404–06).  If the state court applied the correct Supreme Court precedent, and the United States Supreme Court, faced with materially indistinguishable facts, has not reached a decision different from the decision reached by the state court in the petitioner's case, the case does not fit within the "contrary to" clause, and the federal habeas court must proceed to the third step and determine whether the state court "unreasonably applied the relevant Supreme Court authority."  <u>Fugate</u>, 261 F.3d at 1216.  Likewise, if the facts of the Supreme Court cases and the petitioner's case are <u>not</u> substantially similar, "a state court decision that applies 'the correct legal rule' based on Supreme Court law to the facts of the petitioner's case would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law."  *Id.* (citing and quoting <u>Williams</u>, 529 U.S. at 406).  A state court is not required to cite Supreme Court cases or even be aware of the cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them."  <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002).

The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  <u>Williams</u>, 529 U.S. at 410.  The Supreme Court has explained that "a federal habeas court may not issue a writ under the

unreasonable application clause 'simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" <u>Bell v. Cone</u>, 535 U.S. 685, 122 S. Ct. 1843, 1850, 152 L. Ed. 2d 914 (2002) (quoting <u>Williams</u>, 529 U.S. at 411).  Indeed, "[t]he gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 123 S. Ct. 1166, 1175, 155 L. Ed. 2d 144 (2003).  A state court's incorrect application of clearly established law will be held to be reasonable and not warrant a writ unless "thorough analysis by a federal court produces a firm conviction that [the state court] judgment is infected by constitutional error." <u>Williams</u>, 529 U.S. at 389.  "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004) (citation omitted).  Although § 2254(d)(1) is concerned only with federal law as clearly established by the Supreme Court, this court may look to circuit precedent to demonstrate reasonable applications of Supreme Court precedent.  <u>Van Poyck v. Fla. Dep't of Corrections</u>, 290 F.3d 1318, 1322 n.4 (11th Cir. 2002).

In deciding whether a state court decision involved "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" under § 2254(d)(2), determinations of fact are "presumed to be correct," unless the presumption is rebutted by Petitioner "by clear and convincing evidence." § 2254(e)(1); <i>see</i> <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).") (dictum); <u>Fugate</u>, 261 F.3d at 1215 (quoting 28 U.S.C. § 2254(e)(1)); <u>Parker v. Head</u>, 244 F.3d 831, 835–36 (11th Cir. 2001) (citing § 2254(d)(2) and (e)(1)); <i>see also</i> <u>Crawford v. Head</u>, 311 F.3d 1288 (11th Cir. 2002) (explaining that the new statute provides a "highly deferential standard of review" of the state court's factual determinations).  Thus, not only must the state court's factual determination have been unreasonable, but the court's factual findings must be shown unreasonable by clear and convincing evidence. <i>See</i> <u>Callahan v. Campbell</u>, 427 F.3d

897, 926 (11th Cir. 2005) (citing § 2254(e)(1); <u>Rutherford v. Crosby</u>, 385 F.3d 1300, 1308 (11th Cir. 2004) ("[Petitioner] has not shown by clear and convincing evidence that the Florida Supreme Court's factual finding . . . [wa]s unreasonable in light of the evidence in the state court record.")).

Within this framework, the court will review Petitioner's claims.

III.   PETITIONER'S CLAIMS

A.    <u>Ground one: Petitioner was denied his right to self-representation in violation of his Sixth and Fourteenth Amends [sic] right U.S. Const.</u>

(Doc. 8 at 4). Petitioner claims that prior to trial, he filed a motion to represent himself (<i>id</i>.). He contends that although the trial court held a hearing on the motion, the court failed to conduct a proper inquiry of Petitioner's counsel as to the specific grounds of inadequate representation alleged by Petitioner, and the court failed to ask Petitioner if he desired to act as co-counsel for his defense (<i>id</i>.; Doc. 20 at 4).

1.    Clearly Established Federal Law

"The Sixth and Fourteenth Amendments of [the] Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment." <u>Faretta v. California</u>, 422 U.S. 806, 807, 95 S. Ct. 2525, 2527, 45 L. Ed. 2d 562 (1975). The Sixth Amendment, however, also includes the right to self-representation. <i>Id.</i>, 422 U.S. at 831–32. The Supreme Court has held that, "[a]lthough a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." <i>Id.</i> at 835 (internal quotations and citation omitted); <i>see also</i> <u>Patterson v. Illinois</u>, 487 U.S. 285, 298, 108 S. Ct. 2389, 2398, 101 L. Ed. 2d 261 (1988). The Supreme Court also recognized that a defendant's right to represent himself, if he voluntarily elects to do so, "does not encompass the right to choose any advocate if the defendant wishes to be represented by counsel." <i>See</i> <u>Wheat v. United States</u>, 486 U.S. 153, 159 n.3, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988).

2.    Federal Review of State Court Decision

Petitioner raised this claim as his sole ground for relief in the direct appeal of his conviction (Doc. 14, Ex. E at 6). The First DCA affirmed the conviction per curiam. Although the state court's denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable. *See* Helton v. Secretary for Dept. of Corrections, 233 F.3d 1322, 1326–27 (11th Cir. 2000); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000); Hannon v. Cooper, 109 F.3d 330, 335 (7th Cir. 1997).

In determining whether the state court unreasonably applied Supreme Court precedent, this court looks to the Eleventh Circuit's interpretation of the relevant Supreme Court law. The Eleventh Circuit held that the right to counsel "is preeminent over the right to self-representation because the former attaches automatically and must be waived affirmatively to be lost, while the latter does 'not attach unless and until it [i]s asserted.'" Stano v. Dugger, 921 F.2d 1125, 1143 (11th Cir.1991) (en banc) (quoting Dorman v. Wainwright, 798 F.2d 1358, 1366 (11th Cir.1986)). Waiver of the right to counsel and invocation of the correlative right to self-representation is no simple matter, however, and two requirements must be met. First, the defendant must "clearly and unequivocally" assert his desire to represent himself thus waiving his right to counsel. Second, the court must determine that the defendant has made this election "knowingly and intelligently." However, to invoke his Sixth Amendment right under Faretta, a defendant must unambiguously state his request to represent himself, either orally or in writing, so that no reasonable person can say that the request was not made. Dorman, 798 F.2d at 1366. Because of the gravity of the accused's decision, his request to proceed pro se must be clear and unequivocal. Cross v. United States, 893 F.2d 1287, 1290 (11th Cir. 1990) (defendant did not clearly and unequivocally request to represent himself and waive counsel where defendant seemingly requested to proceed pro se, but clarified the nature of his request by explaining that he essentially wished to act as co-counsel) (citations omitted); *see also* Stano, 921 F.2d at 1145 (Faretta inapplicable where defendant did not assert or even "faintly request" right to self-representation, and his conduct showed that he never envisioned representing himself). Once there is a clear assertion of the right to self-representation, the court should conduct the Faretta hearing. Raulerson v. Wainwright, 732 F.2d 803, 808 (11th Cir. 1984). Indeed, "[t]he ideal method of assuring that a waiver of counsel is valid is for the trial court to conduct a

pretrial hearing at which the accused is informed of the charges, basic trial procedures, and hazards of self-representation." United States v. Cash, 47 F.3d 1083, 1088 (11th Cir. 1995) (citing Strozier v. Newsome, 926 F.2d 1100, 1104 (11th Cir. 1991) ("Strozier II")).  This helps to establish that the defendant unambiguously has chosen to represent himself.  Cross, 893 F.2d at 1291.  "While a pretrial hearing is preferred, it is not required. . . . The absence of a hearing will not give rise to a violation of the Sixth Amendment right to counsel in the 'rare cases [where] the record may support a waiver.'"  Cash, 47 F.3d at 1088 (quoting United States v. Fant, 890 F.2d 408, 409 (11th Cir. 1989) (per curiam)).

Courts should not "quickly infer that a defendant unskilled in the law has waived counsel and has opted to conduct his own defense."  Brown v. Wainwright, 665 F.2d 607, 610 (Former 5th Cir. 1982) (full bench en banc) (citing Brewer v. Williams, 430 U.S. 387, 404, 97 S. Ct. 1232, 1242, 51 L. Ed. 2d 424 (1976) (courts must indulge every reasonable presumption against waiver of counsel)).  Equally, a defendant who initially requests to waive counsel may subsequently abandon or waive the waiver.  Dorman, 798 F.2d at 1367 (citing Brown, 665 F.2d at 611).  This may be accomplished through the defendant's request or deduced from his conduct reasonably showing that he has abandoned his original request.  Id.  For example, a defendant who vacillates on the issue or continues to seek the benefit of representation may be found to have relinquished his request to represent himself.  Id. (citing Brown, 665 F.2d at 612).  Additionally, a defendant may waive his right of self-representation by electing to act as co-counsel.  Raulerson, 732 F.2d at 809 (citing Brown, 665 F.2d at 611; Chapman v. United States, 553 F.2d 886, 893 n. 12 (5th Cir.1977)).

While the accused need not "continually renew his request to represent himself even after it is conclusively denied," the request may be considered abandoned if the court leaves the matter open and the defendant fails to re-assert his request.  Brown, 665 F.2d at 611.  In Brown, the trial court expressed doubt as to the ability of the defendant to carry on his own defense and, therefore, deferred ruling on the request and directed counsel to attempt to resolve the difficulties with his client.  Id. at 609.  Because the defendant began to again work with counsel and never renewed his request to proceed pro se despite ample opportunity to do so, he was held to have abandoned his request altogether.  Id. at 611.

In the instant case, the state court record shows that Petitioner's trial counsel, Mr. Spiro Kypreos, filed a motion to withdraw from representation (*see* Doc. 14, Ex. A at 54–55).  At a hearing on the issue on December 3, 2002, Mr. Kypreos represented to the court that when he attempted to discuss Petitioner's case with him, Petitioner told him that he was fired and did not want Mr. Kypreos' representation, and Petitioner refused to communicate with him (*id.*).  The trial court conducted the following inquiry of Petitioner:

> THE COURT:  So I guess the question to Mr. Malone is based upon what Mr. Kypreos says, Mr. Malone, do you want to fire him off of the case?

> THE DEFENDANT:  He do the case, but he act like he don't want to help me.

> THE COURT:  In other words, you don't want to fire him, y'all just don't have the same philosophy on how your case should be defended; is that it?

> THE DEFENDANT:  Yes, sir.

> THE COURT:  All right.  Well, sir, somebody has go to, you know, make that ultimate decision.  And if he says you want to put up an insanity defense and he has no grounds for it, sir, then he can't put up an insanity defense.  He has a legal, ethical obligation not to do so.
> . . . .
> So you know you're going to have to tell me you want him on the case and y'all just disagree as to your defense, or do you want—or do you think that he should be off the case because he's not representing you in a competent manner?

> THE DEFENDANT:  He really ain't representing me in a competent manner.

> THE COURT:  Based on what?

> THE DEFENDANT:  Most of the things he telling me he want me to sign and agree for it.

> THE COURT:  Sign a what?  An agreement?

> THE DEFENDANT:  Yeah.

> THE COURT:  . . . But sir, do you understand that if the State presents to him an agreement that he's under an ethical and legal obligation to pass it along to you?  You can either accept it or reject it.

THE DEFENDANT:  Right.

THE COURT:  Well, I mean he can make recommendations; that's his job. But that's not—that doesn't make him incompetent because he says I think this is a good agreement for you.

THE DEFENDANT:  But look like he forcing it to me.  If I don't sign this—

THE COURT:  . . . Sir, if you think it's a bad agreement for you, don't sign it.  Don't sign it.  Go to trial. . . . Sir—so you say because he presented the agreement, sir, that's not grounds.

THE DEFENDANT:  I know it's not, but he ain't gonna fight hard for me and he put—

THE COURT:  Based on what?

THE DEFENDANT:  Because he put it out in his expression how he talk to me.

THE COURT:  In other words, you don't like the tone of his conversation?

THE DEFENDANT:  (Nods head affirmatively.)

THE COURT:  Anything else?

THE DEFENDANT:  (Shakes head negatively.)

THE COURT:  His oral motion for discharge of the attorney based upon incompetence and representation is denied.

(*id*. at 56–59).

Jury selection occurred on December 16, 2002, and when the selection concluded, Mr. Kypreos informed the court that Petitioner was indicating to him that he wished to "speak for himself" at trial, and Mr. Kypreos stated that he explained to Petitioner that Petitioner would not be asking questions or addressing the jury at trial (*id*. at 64, 107).  The trial court responded that Petitioner's counsel, not Petitioner, would be asking questions of witnesses, and that Petitioner would not be acting as co-counsel (*id*. at 107–08).  The trial court also advised Petitioner that he could testify on his own behalf, and Petitioner responded that he wised to testify (*id*. at 108).

On January 27, 2003, Mr. Kypreos filed a motion for a determination that Petitioner had elected to exercise his right of self-representation (*see* Doc. 14, Ex. A at 123–24).  In the motion, defense counsel described several instances of Petitioner's "persistent and unreasonable refusal to cooperate with court-appointed counsel," and argued that such refusal to cooperate constituted a request for self-representation (*id.* at 124).  The next day, on January 28, 2003, the trial court held a hearing to address counsel's motion (*id.* at 125–44).  The trial court conducted the following inquiry of Petitioner:

> THE COURT:  Well, I guess what we need to find out from Mr. Malone is this.  This is the question, Mr. Malone.  You wish to fire Mr. Kypreos; is that true or not?
>
> THE DEFENDANT:  That's true.
>
> THE COURT:  Sir, just answer my questions.
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  You wish to fire him?
>
> THE DEFENDANT:  Yes, sir.
>
> THE COURT:  Okay.  Do you wish to have another attorney appointed or do you wish to represent yourself?
>
> THE DEFENDANT:  Yes, sir, I'd rather have another attorney appointed.
>
> THE COURT:  So you don't want to represent yourself?
>
> THE DEFENDANT:  No, sir.
>
> THE COURT:  You don't want to self-represent?
>
> THE DEFENDANT:  No, sir.
>
> THE COURT:  You want another lawyer?
>
> THE DEFENDANT:  Yes, sir.
> . . . .
> THE COURT:  You want another attorney, you don't want to represent yourself based upon your complaints against Mr. Kypreos as to something that he is

doing that you say is incorrect or something that he's failing to do that he should be doing; is that correct?

THE DEFENDANT:  That's correct.

(*id*. at 127–29).  At Petitioner's request, the court heard his complaints regarding Mr. Kypreos' representation via Mr. Kypreos' reading of Petitioner's letters to the court dated January 25, 2003, and January 28, 2003, in which Petitioner expressed concern about a "failure of social communication" between himself and counsel, stated that counsel was not working in his best interest, stated that he had filed a complaint against Mr. Kypreos with The Florida Bar, complained that during jury selection he was denied the right to "point out the jurors I feel competent," and complained that counsel had failed to seek suppression of evidence that was disclosed by the State on the eve of trial (*id*. at 129–37).[2]  Additionally, Petitioner presented a letter from himself to Mr. Kypreos dated December 23, 2002, in which he told counsel that he believed the later disclosed evidence should be suppressed, and his case should not have been continued (*id*. at 137–38).  The trial court conducted an inquiry of Mr. Kypreos regarding Petitioner's degree of communication and cooperation with him, as well as counsel's reasons for requesting a continuance of Petitioner's trial (*id*. at 138–44).  The trial court then asked Petitioner whether he had any additional evidence or testimony he wished to offer, and Petitioner responded, "That's all of it." (*id*. at 144).  Based upon the evidence presented, the court denied Petitioner's motion to discharge Mr. Kypreos (*id*.).  Mr. Kypreos inquired of the court whether his motion for a determination that Petitioner had elected to exercise his right of self-representation was denied (*id*. at 177).  The trial court responded that Petitioner did not choose to represent himself or otherwise exercise his right to represent himself; therefore, the issue was moot (*id*. at 177–78).

Upon thorough review of the state court record, this court finds no evidence, in Petitioner's oral motions to discharge counsel, written letters to the trial court, or his oral exchanges with the court, that Petitioner indicated, let alone made a clear and unambiguous request, that he wished to represent himself.

_____

[2]The record shows that on December 16, 2002, the parties selected a jury for Petitioner's trial (Doc. 14, Ex. A at 64–107).  On December 18, 2002, the day before Petitioner's trial, defense counsel filed a motion for continuance based upon the State's late disclosure of evidence, and the trial court granted the motion (*see id.* at 110–21).

Petitioner argues that his request to discharge counsel triggered his right to a <u>Faretta</u> hearing. As discussed *supra*, however, the clearly established Supreme Court law, as interpreted by the Eleventh Circuit, makes clear that to invoke the Sixth Amendment right under <u>Faretta</u>, a defendant must have unambiguously stated his request to <u>represent himself</u>.  *See* <u>Dorman</u>, 798 F.2d at 1366; <u>Cross</u>, 893 F.2d at 1290; <u>Stano</u>, 921 F.2d at 1145.  As the state court record conclusively establishes that Petitioner made no request to represent himself, the state court's denial of his Sixth Amendment claim was not contrary to or an unreasonable application of Supreme Court law.

      B.     <u>Ground two:  Petitioner was denied his Sixth and Fourteenth Amendments [sic] rights U.S. Const. to effective assistance of counsel.</u>

(Doc. 8 at 4).  Petitioner states that counsel was aware that Petitioner suffered from brain damage and despite this awareness, counsel failed to request a competency hearing and seek Petitioner's evaluation by a "clinical neurologist" (*id.*; Doc. 20 at 7).  Petitioner asserts that a clinical neurologist could have testified that Petitioner's brain clots, surgeries, and strokes could have altered his mental state such that he was prevented from making rational decisions during his trial or assisting his counsel (*id.*).  Petitioner claims that as a result of counsel's failure to seek a competency evaluation and determination, he proceeded to trial when he was unable to assist counsel and unable to comprehend what was occurring (Doc. 8 at 4).

      1.     Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  To obtain relief under <u>Strickland</u>, a petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  466 U.S. at 687–88.  It is the petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result thereof.  *Id.* at 687.  If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

In determining whether counsel's performance was reasonable, the Court instructed:

Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after

it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  *Cf*. Engle v. Isaac, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574-1575, 71 L. Ed. 2d 783 (1982).  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  *See* Michel v. Louisiana, *supra*, 350 U.S. at 101, 76 S. Ct. at 164.

Strickland, 466 U.S. at 689.

As to the prejudice prong of the Strickland, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  Strickland, 466 U.S. at 693.  However, the Court has also clarified that a petitioner need not demonstrate it 'more likely than not, or prove by a preponderance of evidence,' that counsel's errors affected the outcome.  Strickland, 466 U.S. at 693–94.  Instead,

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. Strickland, 466 U.S. at 694–95.  "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  *Id.* at 695.

In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.  Moreover, a verdict or conclusion only

weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.  Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695–96.

2.        Federal Review of State Court Decision

Petitioner raised this claim as Ground Nine in his Rule 3.850 motion (Doc. 14, Ex. H at 71).

The state court's written opinion identified the <u>Strickland</u> standard as the applicable standard for

evaluating claims of ineffective assistance of counsel (*id*. at 85).  In the written opinion denying

Petitioner's claim, the trial court included the following analysis:

> Defendant alleges only that he "**may be** physically, mentally, or emotionally incompetent to stand for trial,"[FN 9] not that he **was** incompetent at the time of trial. Although Defendant details a litany of medical issues, he fails to allege how further evaluation by another professional or any further knowledge or action on the part of his counsel would have altered the proceedings.  Defendant makes the bare allegation that his mental defects prevented him from assisting counsel at trial; however, he does not allege how an evaluation would have bolstered his ability to assist counsel; or how his lack of mental acuity prevented his counsel from raising certain issues. He further does not demonstrate how the testimony of a neurologist would have resulted in a finding that he was incompetent to stand trial.  It appears that Defendant also raised these same medical issues before the Court at sentencing, and he made no mention of the fact that they had impaired him in any substantial way.  Rather, he appeared to raise them as a health issue that the Court should consider in sentencing him, not as a mental issue concerning his competency.[FN 10]

> FN 9.  See Defendant's motion, page 12.

> FN 10.  See Attachment 3, Trial transcript excerpts, pages 344–347.

> **Mr. Kypreos** [defense counsel]:  If you want to say anything, now is the time to say it.  Is there anything you want to say about the sentencing?
> **Defendant**:  Yes, I've got medical problems.
> **The Court**:  I can't hear you.
> **Mr. Kypreos**:  He has medical problems.
> **The Court**:  You've got a medical problem?  What is your medical problem?

**Defendant**:  I had brain surgery and blood clots and I'm on a lot of medication and I asked could I bring my medical records in but they never did, you know, my lawyer never did bring them in.

**The Court**:  So what do you think the fact that you've got blood clots, what effect do you think that is supposed to have on me?

**Defendant**:  I'm not in good health, my health—

**The Court**:  So what effect do you think that is supposed to have on me that you're not in good health?

**Defendant**:  (Indicating).

**Mr. Kypreos**:  May I inquire of him on that?

**The Court**:  Sure.

**Mr. Kypreos**:  Mr. Malone, when did you have the brain surgery?

**Defendant**:  I had three operations in the last like two years a part [sic].

**Mr. Kypreos**:  Have you been Baker acted before?  Have you been committed before?

**Defendant**:  Like what?

**Mr. Kypreos**:  Have you ever been determined to be incompetent before, even before this criminal case?

**Defendant**:  No.  I went to work for the school board and they brought me out when I got hurt and became disabled.  I was 100 percent disabled.

**Mr. Kypreos**:  Have you received any kind of hospitalization say in the last five years because of your medical condition?

**Defendant**:  Yeah.

**Mr. Kypreos**:  When was that?

**Defendant**:  That has been about three years ago before I went to prison.

**Mr. Kypreos**:  And what happened then?

**Defendant**:  I passed out again, and another blood clot that came back.

**Mr. Kypreos**:  Have you been bringing medication to court with you every day?

**Defendant**:  Yes.

**Mr. Kypreos**:  Who prescribed that to you?

**Defendant**:  The doctors.

**Mr. Kypreos**:  What is that for?

**Defendant**:  For my high blood pressure and I've got blood thinner too.  I've got Tylenol in case I have headaches and stuff.  I get them headaches real often.

**Mr. Kypreos**:  Are there any other medical factors you want the Judge to consider?

**Defendant**:  That's it.

Furthermore, it appears that the individuals who evaluated Defendant were already on notice of the physical conditions which Defendant describes.  In the competency evaluation report based on an evaluation preformed September 13, 2002, the DCF Senior Psychologist, Dr. Janet Hurley, writes, "Mr. Malone denied any previous history of psychiatric inpatient hospitalizations but, stated his diagnosis was 'blood clots in my head, two strokes, and hypertension.'  Mr. Malone reported that he had 'three brain operations and bad headaches'."[FN 11]  Dr. Hurley also notes, "Although, Mr. Malone does have some documented neurological risk factors for cognitive deficits S/P a left-side subdural hemotoma [sic] (from 1987) his psychological profile has been more consistent with malingering."[FN 12]

> FN 11.  See Attachment 4, DCF Competency Evaluation Report, page 4.
>
> FN 12.  See Attachment 4, DCF Competency Evaluation Report, page 3.

In a March 6, 2002, report based on a court-ordered evaluation, Dr. James Larson wrote, "I do see on a request form that the inmate stated he had blood clots three times on his head and 'three operations and two strokes'.  On the front of the chart there is a documentation of an old head injury but no further details are offered. I see he gave a brief history when he came into the jail on the H & P of prior brain tumor and with brain surgery in 2000."[FN 13]  Later in the report, Dr. Larson writes, "The Defendant reported that he thinks he has been in the hospital three times for brain surgery.  He reported that he suffers from a neurological condition that runs in his family."[FN 14]  Later, he writes, "The Defendant went on to stress his neurological impairments."[FN 15]

> FN 13.  See Attachment 5, Psychological Associates' Report, page 2.
>
> FN 14.  See Attachment 5, Psychological Associates' Report, page 2.
>
> FN 15.  See Attachment 5, Psychological Associates' Report, page 3.

In Dr. Lawrence Gilgun's report filed April 16, 2002, he writes of Defendant, "For instance on several occasions, he volunteered that he had three neurosurgeries performed by Dr. Cisco and had suffered two strokes.  He gave these as reasons as to why he was so impaired."[FN 16]  Clearly, the professionals evaluating Defendant's competence were on notice of the physical issues Defendant faces, and without exception, appeared to believe Defendant was malingering and exaggerating his alleged impairment.

> FN 16.  See Attachment 6, Lawrence Gilgun's Evaluation Report, page 2.
>
> Florida law does not require that individuals alleging the sort of medical issues Defendant claims must receive neurology examinations before they may be considered competent to proceed to trial.  Defendant has presented no new information which would lead the Court to believe the evaluation that Defendant received was flawed, or that further evaluation would have produced a different result.

(Doc. 14, Ex. H at 81–85).  Based upon these findings, the state court concluded that Petitioner failed to demonstrate he was prejudiced by the lack of further evaluation or the quality of evaluation he received (*id.* at 85).  The court concluded that in the absence of a showing of such prejudice, defense counsel could not be deemed to have rendered ineffective assistance of counsel (*id.*).

As previously noted, the state court correctly identified the two-prong <u>Strickland</u> standard as applicable to claims of ineffective assistance of counsel.  Additionally, the state court's factual findings are presumed correct, as Petitioner has failed to rebut those findings with clear and convincing evidence.  Therefore, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable application of <u>Strickland</u>.

In the state court proceedings and the instant federal proceeding, Petitioner alleges that a clinical neurologist <u>could</u> have testified that Petitioner's blood clots, surgeries, and strokes <u>could</u> have affected his mental state to the degree that he was prevented from assisting his trial counsel and making rational decisions regarding his trial; however, Petitioner provided no factual basis to show that such an expert would have testified that Petitioner's medical condition actually affected Petitioner's mental condition to the degree that he was incompetent to stand trial.  Furthermore, as the state court found, Petitioner does not identify how his medical problems actually affected his ability to assist counsel or make decisions regarding his trial.  Because Petitioner failed to demonstrate that a medical expert would have testified that Petitioner's medical condition affected his mental state to the degree that he was unable to assist in his defense or understand the proceedings, the state court's conclusion that Petitioner failed to establish he was prejudiced by counsel's failure to seek another competency evaluation and determination was not unreasonable. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

C.      Ground three:  Petitioner was denied his 6th and 14th Amendment right to effective assistance of counsel.

(Doc. 8 at 5).  Petitioner alleges defense counsel failed to challenge the sufficiency of the evidence supporting the conspiracy to traffic cocaine charge (*id*.).   Petitioner states that the record demonstrates there were no co-defendants, and the only evidence of a co-conspirator was "compound inferences" (*id*.).  In his reply to Respondent's answer, Petitioner clarifies that he is not claiming that his counsel failed to move for judgment of acquittal, rather, he is claiming that his counsel failed to file a pre-trial motion to dismiss the conspiracy charge based upon insufficient evidence (*see* Doc. 8 at 9–10).

1.      Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

2.      Federal Review of State Court Decision

Petitioner raised this claim in Ground nine of his Rule 3.850 motion (Doc. 14, Ex. H at 71).  As discussed *supra*, the state court's written opinion identified the Strickland standard as the applicable standard for evaluating claims of ineffective assistance of counsel (*id*. at 85).  The state court found that to the extent Petitioner claimed that his counsel erred by failing to move for a judgment of acquittal, the record refuted the claim as the trial transcript showed that counsel made a motion for judgment of acquittal on the conspiracy charge, and the trial court denied the motion (*id*. at 86).  Additionally, the state court concluded that to the extent Petitioner faulted counsel for failing to file a pre-trial motion to dismiss the conspiracy charge, Petitioner failed to demonstrate that a motion to dismiss would properly have been granted by the trial court (*id*.).

As previously noted, the state court correctly identified the two-prong Strickland standard as applicable to claims of ineffective assistance of counsel.  Additionally, the state court's factual findings are presumed correct, as Petitioner has failed to rebut those findings with clear and convincing evidence.   Therefore, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable application of Strickland.

To the extent Petitioner claims that his counsel erred by failing to make a motion for judgment of acquittal on the conspiracy count, Petitioner failed to establish that his counsel performed deficiently.  The trial transcript shows that counsel moved for judgment of acquittal on

the conspiracy count, arguing that there was insufficient evidence to show that there was a conspiracy between Petitioner and Dedrick "Chris" Geter (*see* Doc. 14, Ex. D at 223–26). Therefore, the state court's denial of this aspect of Petitioner's claim was not unreasonable.

The state court's decision was also reasonable with regard to Petitioner's claim that his counsel performed ineffectively by failing to file a pre-trial motion to dismiss the conspiracy charge. Pursuant to Rule 3.190(c)(4) of the Florida Rules of Criminal Procedure, a defendant may move for dismissal alleging in the motion that "[t]here are no material disputed facts and the undisputed facts do not establish a prima facie case of guilt against the defendant." Fla. R. Crim. P. 3.190(c)(4). Under this rule, Defendant has the burden to specifically allege and swear to the undisputed facts in a motion to dismiss and to demonstrate that no prima facie case exists upon the facts set forth in detail in the motion. State v. Kalogeropolous, 758 So. 2d 110, 111 (Fla. 2000). The State need only specifically dispute a material fact alleged by the defendant or add additional material facts that meet the minimal requirement of a prima facie case. *Id.* at 112. If a material fact is disputed, denial of the motion to dismiss is mandatory. *Id.* (citing Boler v. State, 678 So.2d 319, 323 (Fla. 1996)). The State is not obliged to produce evidence sufficient to sustain a conviction; as long as the State shows the barest prima facie case, it should not be prevented from prosecuting. State v. Bonebright, 742 So.2d 290, 291 (Fla. 1st DCA 1998) (citation omitted). If the State's evidence is all circumstantial, whether it excludes all reasonable hypotheses of innocence may only be decided at trial, after all of the evidence has been presented. *Id.* (citation omitted). In considering a motion to dismiss the information in a criminal case, the trial court must construe all evidence and inferences in a light most favorable to the State. *Id.* (citation omitted).

In the instant case, Petitioner contends his counsel should have filed a pre-trial motion to dismiss on the ground that there were no co-defendants named in the case, and the only evidence that a co-conspirator existed was from "compound inferences" (*see* Doc. 20 at 10). Although the fact that there were no co-defendants charged in Petitioner's case is undisputed, the fact that the other evidence was circumstantial would have required the trial court to deny the motion to dismiss because whether the circumstantial evidence excluded all reasonable hypotheses of innocence is an issue that must be decided at trial. *See* Bonebright, 742 So. 2d at 291. Furthermore, in light of the fact that the evidence adduced by the State was sufficient to survive defense counsel's motion for

judgment of acquittal, Petitioner failed to show a reasonable probability that the trial court would have granted a pre-trial motion to dismiss. Therefore, Petitioner has failed to show that the state court's denial of his claim was an unreasonable application of <u>Strickland</u>.

      D.     <u>Ground four:  Petitioner was denied his 6th and 14th Amendment right to effective assistance of counsel.</u>

(Doc. 8 at 5). Petitioner alleges his counsel performed ineffectively by failing to seek a directed verdict on the conspiracy charge on the ground that the evidence was sufficient to support only the lesser charge of sale of cocaine (*id.*).

      1.     Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

      2.     Federal Review of State Court Decision

Petitioner raised this claim in Ground nine of his Rule 3.850 motion (Doc. 14, Ex. H at 71). As discussed *supra*, the state court's written opinion identified the <u>Strickland</u> standard as the applicable standard for evaluating claims of ineffective assistance of counsel (*id*. at 85). The state court addressed this claim in the same discussion as the previous ground for relief (counsel's failure to file a pre-trial motion to dismiss the conspiracy count) (*id*. at 86). The state court found that to the extent Petitioner claimed that his counsel erred by failing to move for a judgment of acquittal, the record refuted the claim as the trial transcript showed that counsel made a motion for judgment of acquittal on the conspiracy charge, and the trial court denied the motion (*id*. at 86).

As previously noted, the state court correctly identified the two-prong <u>Strickland</u> standard as applicable to claims of ineffective assistance of counsel. Additionally, the state court's factual findings are presumed correct as Petitioner has failed to rebut those findings with clear and convincing evidence. Therefore, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable application of <u>Strickland</u>.

In Florida, the statutory practice of granting directed verdicts was abolished in favor of the federal practice of having the judge enter a judgment of acquittal upon adoption of Rule 3.380 of the Florida Rules of Criminal Procedure in 1968. *See* Fla. R. Crim. P. 3.380, Committee Notes, 1968 Adoption. The state court record confirms the state court's finding that Petitioner's counsel made a motion for judgment of acquittal on the conspiracy count at the close of the State's case (*see*

Doc. 14, Ex. D at 223–26).  Furthermore, defense counsel argued that there was evidence that Petitioner was involved in several transactions involving the sale of cocaine, but the evidence was insufficient to show he was involved in a conspiracy (*id*. at 224).  Therefore, Petitioner failed to demonstrate that his counsel performed deficiently.  Furthermore, the trial court denied the motion for judgment of acquittal, thereby concluding that the evidence was sufficient to support the conspiracy charge (*id*. at 226–27).  Petitioner has failed to demonstrate a reasonable probability that the trial court's decision would have been different if defense counsel had specifically included a request for a directed verdict of guilty on the lesser included charge of sale of cocaine.  Therefore, the state court's denial of his claim was not unreasonable.

     E.    <u>Ground five:  Petitioner was denied his 6th and 14th Amendment right to effective assistance of counsel.</u>

(Doc. 8 at 7).  Petitioner asserts that his trial counsel failed to file a pre-trial motion to suppress evidence on the ground that the chain of custody was broken and the evidence was not properly handled (*id*.).  Petitioner states that Detective Allday admitted that he took the cocaine that he allegedly purchased from Petitioner to his own house for two days and then gave it to Investigator Vinson, who kept the cocaine for an additional six days while the two of them worked on a joint drug operation, before the officers finally took the cocaine to the evidence department of the sheriff's department (Doc. 8 at 16–17).  Petitioner states he asked his counsel to seek suppression of the cocaine on the ground that it was not the same cocaine allegedly purchased from Petitioner, but counsel failed to do so (*id*. at 17).

     1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

     2.    Federal Review of State Court Decision

Petitioner raised this claim in Ground nine of his Rule 3.850 motion (Doc. 14, Ex. H at 71).  As discussed *supra*, the state court's written opinion identified the <u>Strickland</u> standard as the applicable standard for evaluating claims of ineffective assistance of counsel (*id*. at 85).  The state court found as fact that when defense counsel questioned Detective Allday about the gap between the date of one of the drug transactions involving Petitioner and the date the cocaine from that transaction was logged in at the evidence room, Allday responded that the cocaine was maintained

in his custody until he turned it in to the evidence department (*id.* at 93). Based upon this testimony, the state court determined that the record failed to demonstrate that there was a break in the chain of custody (*id.*). The state court further concluded that even if there was a break in the chain of custody, Petitioner failed to demonstrate a probability that the evidence was tampered with, and in the absence of this showing, there was no basis for suppression of the evidence under Florida law (*id.*). Therefore, the court concluded Petitioner was not entitled to relief on his ineffective assistance of counsel claim because he failed to show that a motion to suppress would have been granted (*id.*).

As previously noted, the state court correctly identified the two-prong <u>Strickland</u> standard as applicable to claims of ineffective assistance of counsel. Additionally, the state court's factual findings are presumed correct as Petitioner has failed to rebut those findings with clear and convincing evidence. Therefore, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable application of <u>Strickland</u>.

Under Florida law, to bar the introduction of otherwise relevant evidence due to a gap in the chain of custody, a defendant must show there was a probability that the evidence was tampered with. *See* <u>Floyd v. State</u>, 850 So. 2d 383, 299 (Fla. 2002) (citing <u>State v. Taplis</u>, 684 So. 2d 214, 215 (Fla. 5th DCA 1996) (party attempting to exclude relevant physical evidence based on gap in chain of custody must show probability of tampering); <u>Jordan v. State</u>, 707 So. 2d 816, 818 (Fla. 5th DCA 1998) (when gap in chain of custody is alleged, party seeking to prevent introduction of relevant physical evidence must show a probability of evidence tampering because "[a] mere possibility of tampering is insufficient") (relying on <u>State v. Taplis</u>), *approved*, 720 So. 2d 1077 (Fla. 1998); <u>Bush v. State</u>, 543 So. 2d 283, 284 (Fla. 2d DCA 1989) ("A mere break in the chain of custody is not in and of itself a basis for exclusion of physical evidence. Rather, the court should consider the probability that the evidence has been tampered with during the interim for which it is unaccounted.")). A bare allegation by a defendant that a chain of custody has been broken is not sufficient to render relevant physical evidence inadmissible. <u>Floyd</u>, 850 So. 2d at 299 (citing <u>Terry v. State</u>, 668 So. 2d 954, 959 n.4 (Fla. 1996)). Likewise, a mere possibility of tampering is insufficient. <u>Davis v. State</u>, 788 So. 2d 308, 210 (Fla. 5th DCA 2001) (citation omitted)

In the instant case, although Petitioner alleged the existence of evidence showing that law enforcement officers maintained custody of the cocaine for several days prior to placing it in the

evidence department of the sheriff's department, Petitioner failed to allege the existence of any evidence indicating that the cocaine was tampered with.  In the absence of such evidence, the trial court would not have had a legal basis to grant a motion to suppress if defense counsel had made one.  Because Petitioner has failed to establish a meritorious basis for a motion to suppress, he cannot demonstrate that counsel was deficient for failing to file the motion, nor can he demonstrate that he was prejudiced by counsel's failure to file the motion.  Therefore, the state court's denial of this claim was not unreasonable.

F.      Ground six:  Petitioner was denied his 6th and 14th Amendment right to effective assistance of counsel.

(Doc. 8 at 7).  Petitioner next claims that his counsel performed ineffectively by failing to seek suppression of evidence, specifically, thirteen videotapes, that the State failed to produce during discovery in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (id.).  Petitioner concedes that the State disclosed the existence of the videotapes one day prior to trial, and defense counsel was granted a six-week continuance to review the tapes; however, Petitioner contends defense counsel should have sought suppression of the tapes on the ground that six weeks was not sufficient time to review them, and there was a probability that the tapes may have been tampered with during the fourteen months they were withheld from the defense (see Doc. 8 at 19).

1.      Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth supra.

2.      Federal Review of State Court Decision

Petitioner raised this claim in Ground nine of his Rule 3.850 motion (Doc. 14, Ex. H at 71). As discussed supra, the state court's written opinion identified the Strickland standard as the applicable standard for evaluating claims of ineffective assistance of counsel (id. at 85).  The state court determined that Petitioner failed to show that the alleged discovery violation was willful or that he was prejudiced in his ability to prepare for trial (id. at 94).  The state court further found that Petitioner failed to allege or demonstrate a probability that the tapes were tampered with or altered (id. at 94–95).  The court found that although Petitioner claimed that Detective Allday kept the tapes at his house, the record reflects that they were found at the jail under another case number (id. at 95).

Furthermore, the state court found that although Petitioner complained that he had only six weeks to review the approximately 90 minutes of tapes after the trial court granted a continuance, he did not allege what he might have uncovered or presented had he had additional time to review the tapes (*id.*).  The court found that defense counsel made a strategic decision to request a continuance rather than immediately seeking suppression of the evidence, as counsel explained during a hearing on January 28, 2003 (*id.*).  The state court concluded that Petitioner failed to show that he was prejudiced by counsel's failure to seek suppression of the tapes, and he failed to show that a motion to suppress would have been granted if counsel had made one (*id.*).

As previously noted, the state court correctly identified the two-prong <u>Strickland</u> standard as applicable to claims of ineffective assistance of counsel.  Additionally, the state court's factual findings are presumed correct, as Petitioner has failed to rebut those findings with clear and convincing evidence.   Therefore, Petitioner is entitled to federal habeas relief only if he demonstrates that the state court decision was based upon an unreasonable application of <u>Strickland</u>.

With regard to counsel's performance, the Eleventh Circuit has stated:

> Trying cases is no exact science.  And as a result, we must never delude ourselves that the fair review of a trial lawyer's judgment and performance is an activity that calls for great precision or for a categorical approach.  When reviewing whether an attorney is ineffective, courts "should always presume strongly that counsel's performance was reasonable and adequate."  <u>Atkins v. Singletary</u>, 965 F. 2d 952, 958 (11th Cir. 1992).  And, "a court should be highly deferential to those choices . . . that are arguably dictated by a reasonable trial strategy."  <u>Devier v. Zant</u>, 3 F. 3d 1445, 1450 (11th Cir. 1993).  Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it can be shown that no reasonable lawyer, in the circumstances would have done so.

<u>Rogers v. Zant</u>, 13 F. 3d 384, 386 (11th Cir. 1994); <u>Grayson v. Thompson</u>, 257 F.3d 1194, 1216 (11th Cir. 2001) (to show counsel's performance was unreasonable, defendant must establish that no competent counsel would have taken the action that his counsel did take); <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (issue is not what is possible, prudent, or appropriate, but what is constitutionally compelled) (citing <u>Burger v. Kemp</u>, 483 U.S. 776, 107 S. Ct. 3114, 3126, 97 L. Ed. 2d 638 (1987)).

However, not every strategic decision passes constitutional muster.  Whether a particular decision by counsel was a tactical one is a question of fact, Hardwick v. Crosby, 320 F.3d 1127, 1163 (11th Cir. 2003), and the state court's resolution of that issue enjoys a strong presumption of correctness.  *See* 28 U.S.C. § 2254(e)(1); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995); Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991). Whether a particular tactical decision was a reasonable one, however, is a question of law.  Hardwick 320 F.3d at 1163; Jackson, 42 F.3d at 1367; Horton, 941 F.2d at 1462.

In the instant case, the state court found as fact that counsel's decision not to seek suppression of the later disclosed evidence was a tactical decision.  Petitioner failed to rebut this finding with clear and convincing evidence; therefore, this court presumes that the finding is correct. The only remaining issue is whether counsel's decision was reasonable.  Counsel had no meritorious basis for seeking suppression of the evidence under Brady because the evidence was disclosed by the State prior to trial.  *See* Banks v. Dretke, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004) (three elements establish a Brady violation: (1) the evidence must be favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice).  Additionally, counsel had no basis to seek suppression of the tapes on the ground that they were tampered with because the state court found as fact that the tapes were maintained at the jail, and Petitioner does not allege the existence of any evidence indicating a probability that the tapes were tampered with or altered (*id*. at 94–95).

Furthermore, to the extent Petitioner contends that counsel should have sought suppression of the tapes pursuant to Rule 3.220(b)(3) of the Florida Rules of Criminal Procedure, he has failed to demonstrate that counsel's decision to seek a continuance to review the newly disclosed evidence, as opposed to seeking exclusion of the tapes pursuant to Rule 3.220(b)(3), was unreasonable.  Rule 3.220(b)(3) of the Florida Rules of Criminal Procedure provides that the trial court may prohibit the State from introducing into evidence any material listed in 3.220(b)(1), including any recorded statements made by the defendant and electronic surveillance of conversations to which the defendant was a party, that was not disclosed to the defense and was required to be disclosed.  Fla. R. Crim. P. 3.220(b)(3).  Although it is within a trial court's discretion to order exclusion of

evidence, this is an extreme remedy that should be invoked only after the trial court has determined that no other reasonable alternatives may be used to overcome or mitigate possible prejudice, including a continuance of trial.  *See* Donaldson v. State, 656 So. 2d 580, 581 (Fla. 1st DCA 1995) (citations omitted).  In the instant case, defense counsel stated during a pre-trial hearing on defense counsel's motion to withdraw, that his reasons for seeking a continuance on the eve of trial upon the State's late disclosure of the audiotapes was that he wanted to review the tapes to determine if they contained exculpatory information, and to the extent the tapes contained inculpatory information, he wanted time to review the tapes with Petitioner (*see* Doc. 14, Ex. A at 140–42).  Based upon this testimony, the undersigned concludes that defense counsel's decision to seek a continuance, as opposed to exclusion, was reasonable.  Furthermore, Petitioner has failed to show that even if defense counsel had moved to exclude the evidence, instead of requesting a continuance, there is a reasonable probability that the trial court would properly have granted exclusion instead of a continuance.  Although Petitioner alleges that the continuance did not afford the defense enough time to review the tapes, he does not allege the existence of any evidence indicating that defense counsel was unprepared to address the new evidence at trial after the six-week continuance; thus, Petitioner failed to show that no reasonable alternative to exclusion existed.  Because Petitioner failed to demonstrate that no competent counsel would have taken the action his counsel took, he cannot establish that counsel performed unreasonably by failing to seek exclusion of the tapes.  Furthermore, Petitioner failed to show a reasonable probability that the trial court would have granted a motion to exclude the tapes if counsel had made one.  Therefore, the state court's decision denying Petitioner's claim was not unreasonable.

      G.    Ground seven:  Petitioner was denied his constitutional right to effective assistance of appellate counsel in violation of his 6th and 14th Amendment Rights U.S. Const.

(Doc. 8 at 8).  Petitioner claims that his appellate counsel performed ineffectively by failing to raise on direct appeal the issue of the trial court's denial of defense counsel's motion for judgment of acquittal on the conspiracy charge on the ground that the evidence did not establish that the conspiracy involved a quantity of cocaine over 400 grams (*id*.; Doc. 20 at 21).

      1.    Clearly Established Federal Law

The standards and guidelines for judging a claim of ineffective assistance of counsel are the same for charges relating to both trial and appellate counsel. Smith v. Robbins, 528 U.S. 259, 287–89, 120 S. Ct. 746, 145 L. Ed. 2d 756 (2000) (citing Strickland, 466 U.S. 668). A petitioner must first show that counsel unreasonably failed to raise a particular claim. Id. (citing Strickland, 466 U.S. at 687–91). If he succeeds in making such a showing, he then has the burden of demonstrating a reasonable probability that, but for his counsel's unreasonable failure to raise the claim, he would have prevailed on his appeal. Id. (citing Strickland, 466 U.S. at 694). "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." Id. at 288 (citing Jones v. Barnes, 463 U.S. 745, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983)).

2.      Federal Review of State Court Decision

Petitioner raised this claim as his sole ground for relief in his state habeas petition alleging ineffective assistance of appellate counsel (see Doc. 14, Ex. M). The First DCA denied the petition per curiam on the merits. Malone v. State, 930 So.2d 709 (Fla. 1st DCA Apr. 27, 2006). Although the state court denial of Petitioner's claim without opinion provides no guidance to this court in determining the rationale for its decision, this court must still defer to the state court decision unless review of the record shows that decision to be unreasonable. See Helton, 233 F.3d at 1326–27; Delgado, 223 F.3d at 982; Hannon, 109 F.3d at 335.

In the instant case, Petitioner has failed to show a reasonable probability that the state court would have reversed his conviction on the conspiracy charge. Petitioner's trial counsel properly preserved the issue of the sufficiency of the evidence on the conspiracy charge by moving for judgment of acquittal on that charge. Under Florida law, a de novo standard of review applies in reviewing the denial of a motion for judgment of acquittal. Reynolds v. State, 934 So. 2d 1128, 1145 (Fla. 2006) (citation omitted). Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence. Id. (citations omitted). If, after viewing the evidence in a light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction. Id. (citations omitted). In moving for a judgment of acquittal, a defendant "admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that

a jury might fairly and reasonably infer from the evidence." *Id.* (quoting <u>Beasley v. State</u>, 774 So. 2d 649, 657 (Fla.2000) (internal quotation omitted)).  The Florida Supreme Court has stated that "courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." *Id.* (citation omitted).

Under Florida law in effect at the time of Petitioner's trial, conspiracy to traffic in cocaine in the amount of 400 grams or more but less than 150 kilograms, was defined as a person's agreeing, conspiring, combining, or confederating with another person or persons to sell, purchase, manufacture, deliver, or bring into the State 400 grams or more of cocaine but less than 150 kilograms of cocaine.  *See* Fla. Stat. §§ 777.04(3), 893.135(5).  Thus, to prove the crime of conspiracy to traffic in cocaine in the amount of 400 grams or more but less than 150 kilograms, the State was required to prove the following elements beyond a reasonable doubt:

> 1.     The intent of defendant was that the offense of sale, purchase, or delivery of a quantity of at least 400 grams but less than 150 kilograms of cocaine would be committed.
>
> 2.     In order to carry out the intent, defendant agreed, conspired, combined, or confederated with Dedrick "Chris" Geter to cause the sale, purchase, or delivery of a quantity of at least 400 grams but less than 150 kilograms of cocaine to be committed either by them, or one of them, or by some other person.

*See* The Florida Bar 2002 Florida Standard Jury Instructions in Criminal Cases, Fourth Edition, Part Two:  Instruction on Crimes, Chapter 5.3 Criminal Conspiracy (2002) (instruction adopted in 1981). Under Florida law, it was not necessary that the State prove that the agreement, conspiracy, combination, or confederation to sell, purchase, or deliver the cocaine was expressed in any particular words or that words passed between the conspirators.  *Id.*  Furthermore, it was not necessary that the State prove that Petitioner committed any act in furtherance of the offense he conspired to commit.  *Id.*

In Petitioner's case, the primary witness for the prosecution was Scott Allday.  He testified that during the months of September, October, and November 2001, he worked as an undercover narcotics investigator for the Escambia County Sheriff's Office (Doc. 14, Ex. C at 67).  He testified that on September 11, 2001, he and Investigator Vlack were working undercover to purchase crack

cocaine (*id.* at 68).  They went to a motel and told a female that they wished to purchase crack cocaine and were looking for Petitioner (*id.*).  The female told them to wait, and she made a telephone call (*id.*).  Petitioner subsequently came to the motel room and sold the investigators a quantity of crack cocaine for $100 (*id.* at 68–69).  Investigator Allday identified Petitioner as the man who sold them the cocaine (*id.* at 69).  Allday testified that Investigator Vlack was wearing a hidden video camera and recorded the drug transaction (*id.* at 70).  The videotape and an audiotape of the transaction were admitted into evidence, and the videotape were published to the jury (*id.* at 70–78).  Investigator Allday described a similar transaction on September 14, 2001, in which he purchased crack cocaine from Petitioner, and the jury heard the audiotape of that transaction (*id.* at 78–86).

Investigator Allday described another occasion on September 19, 2001, in which he purchased crack cocaine from Petitioner, and the jury heard the audiotape of that transaction as well (*id.* at 86–96).  Allday testified that during the September 19 transaction, he told Petitioner he wished to purchase more than $1,000 worth of cocaine (*id.* at 90).  Petitioner told Allday that he (Petitioner) had a partner named Chris, and they would take care of him (Allday) (*id.* at 90–91).  Petitioner told a woman named Trish to write his cell phone number on a piece of paper and give it to Allday so he could contact him in the future, and Trish did so (*id.* at 90–91).  The audiotape of the exchange between Petitioner and Allday was published to the jury (*id.* at 93–96).

On September 21, 2001, Petitioner sold Allday 25.3 grams of crack cocaine for $2,000.00 (*id.* at 98–104).  The audiotape of that transaction was published to the jury (*id.* at 112–22).  On October 31, 2001, Investigator Allday purchased $100.00 worth of crack cocaine from Petitioner (*id.* at 126–32).

On November 16, 2001, Allday again purchased $100.00 worth of crack cocaine from Petitioner (*see id.* at 135–37), and during that transaction, Allday and Petitioner discussed Allday's future purchase of 1,000 grams of powder cocaine on November 27 (*id.* at 137–38).  Allday testified that Petitioner stated he was calling his partner Chris, and Petitioner appeared to be having a phone conversation with Chris (*id.* at 138).  Allday did not specifically recall the nature of the conversation, but the meeting on November 16 was audio taped, and the audiotape was published

to the jury (*id.* at 135–40).  The following is a transcript of the meeting between Petitioner and Investigator Allday on November 16, 2001:

        INVESTIGATOR ALLDAY:  Hello.

        (Inaudible.)

        UNIDENTIFIED SPEAKER:  Okay.  Is it gone? (Inaudible).

        THE DEFENDANT:  I tell you what—

        INVESTIGATOR ALLDAY:  I would like to get about 18.

        THE DEFENDANT:  Eighteen ounces?

        INVESTIGATOR ALLDAY:  Depending on the price.

        THE DEFENDANT:  Okay.  Well, I get you a key for (inaudible).

        INVESTIGATOR ALLDAY:  A full key for fifteen-nine?

        THE DEFENDANT:  (Inaudible).  It don't take but one day.  I'll have it Friday.  (Inaudible) and come back—

        (Inaudible.)

        INVESTIGATOR ALLDAY: (Inaudible). I can't give you the money today. (Inaudible).

        THE DEFENDANT:  Okay  I tell you what, you (inaudible) you know what (inaudible).

        INVESTIGATOR ALLDAY:  (Inaudible).  All right.  November the 27th, that's a Tuesday.

        (Inaudible.)

        INVESTIGATOR ALLDAY:  No, no, no, no.  Today is the 16th.  I'm leaving in the morning on the 17th.  I should be back the 25th.  But I know I'll be here on the 27th.  I know for a fact that I'll be here the 27th and I'll have the cash money.

THE DEFENDANT:  Okay.  All right.  (Inaudible).  I may have to go with my 5,000 (inaudible) and tell them (inaudible).

(Inaudible.)

THE DEFENDANT:  Oh, yeah, they — (inaudible).  Don't even worry about that.  I (inaudible) just like this here.  And they give me no problem.  So I know I can deal (inaudible).

INVESTIGATOR ALLDAY:  Uh-huh.

THE DEFENDANT:  And maybe they'll cut me a little slack.

(Inaudible.)

THE DEFENDANT:  (Inaudible) a full for fifteen-nine?

INVESTIGATOR ALLDAY:  A full for fifteen-nine?

THE DEFENDANT:  Uh-huh.  That's a 38 key.

INVESTIGATOR ALLDAY:  All right.

THE DEFENDANT:  Thirty-eight key.

INVESTIGATOR ALLDAY:  Thirty-eight what?

THE DEFENDANT:  Thirty-eight ounces (inaudible).

INVESTIGATOR ALLDAY:  All right.  Thirty-eight ounces.

(Inaudible.)

INVESTIGATOR ALLDAY:  Between you and me, man.  I know you.  I know you (inaudible).

(Inaudible.)

INVESTIGATOR ALLDAY:  I work with you (inaudible).  I don't want nobody else to see me.  I don't want no (inaudible).

THE DEFENDANT:  All right.

INVESTIGATOR ALLDAY:  (Inaudible).  Tuesday (inaudible).

THE DEFENDANT:  Okay.

(Inaudible).

INVESTIGATOR ALLDAY:  That's a lot of money to bring here, so I tell you what.  I'll (inaudible) and you can bring it to me.  Does that sound good?  How much more is it going to be?  (Inaudible) going to check it out or—

THE DEFENDANT:  Look here.  (Inaudible) on a big deal like that.

(Inaudible.)

INVESTIGATOR ALLDAY:  That's fine.  (Inaudible).

(Inaudible.)

INVESTIGATOR ALLDAY:  I deal with you—when I get back in town and I'll let you know I got it.

(Inaudible.)

INVESTIGATOR ALLDAY:  And I know you want to sell it.

(Inaudible.)

THE DEFENDANT:  (Inaudible.)  Yeah, (inaudible) nobody else play.  Be cool with it.

You need anything before you go?

(Inaudible.)

INVESTIGATOR ALLDAY:  I got $100.

THE DEFENDANT:  (Inaudible) coming up (inaudible).

INVESTIGATOR ALLDAY:  You got a cigarette around here?

THE DEFENDANT: (Inaudible) because you all right.  (Inaudible).  I do that for you.

INVESTIGATOR ALLDAY:  All right.

(Inaudible.)

INVESTIGATOR ALLDAY:  All right.  I'm straight up now.

THE DEFENDANT:  I'm straight up with you, bro.

(Inaudible)

INVESTIGATOR ALLDAY:  (Inaudible.)  You ain't scared of  hundreds,
are you?

THE DEFENDANT:  No, (inaudible.)

(Inaudible.)

THE DEFENDANT:  Ain't no problem.  Ain't no problem at all.

INVESTIGATOR ALLDAY:  You can handle it.

THE DEFENDANT:  I can handle it.

(Inaudible.)

INVESTIGATOR ALLDAY:  All right.  I'm going to get out of here.  All
right.  Now, straight up?

THE DEFENDANT:  Straight up.

(Inaudible.)

INVESTIGATOR ALLDAY:  All right.

(Conclusion of the playing of the audiotape.)

(*id.* at 140–44).  Investigator Allday testified that the term key refers to a kilogram, and that the

reference to 38 meant a kilogram being delivered as 38 ounces (*id.* at 144).

Investigator Allday had two conversations with Petitioner on November 26, 2001, one

conversation in a motel room, and the other in Allday's vehicle (*id.* at 148–49).  During the first

conversation, Petitioner told Allday that the price for the kilo had increased from $16,000 to

$22,000, and Petitioner presented four options to Allday (*id.*).  Investigator Allday left the motel, returned a short time later, and suggested that he (Allday) purchase four cookies of crack cocaine for $3,000; he would give Petitioner and Chris $11,000; Petitioner and Chris would contribute $8,000; Allday would take 18 ounces and Petitioner and Chris would take 18 ounces; Allday would rent Petitioner and Chris a car; and Petitioner and Chris would travel to St. Petersburg the next day, pick up the cocaine, and bring it back (*id.* at 149).  Allday spoke to Petitioner in person and to Chris on the telephone, and Petitioner and Chris agreed to the plan (*id.*).  Both conversations on November 26 were audio taped, and the tapes were published to the jury (*id.* at 149–63).  The following is the relevant portion of the audiotape of the second meeting between Petitioner and Allday:

> INVESTIGATOR ALLDAY: All right.  You and your boy—I come up with the money and I front y'all, but we go in half on this thing.  All right?  I'll come up with 11.

> THE DEFENDANT:  $11,000?

> INVESTIGATOR ALLDAY:  $11,000.  Can you get me four?

> THE DEFENDANT:  I can get you more than four.

> INVESTIGATOR ALLDAY:  No, I'm talking about four.  You said you could get the hard.

> THE DEFENDANT:  I can get you some hard.

> INVESTIGATOR ALLDAY:  How many hard can you get me?

> THE DEFENDANT:  How many do you want?

> INVESTIGATOR ALLDAY:  Can you get me four for $3,000?

> THE DEFENDANT:  Four for $3,000?  Give me (inaudible).  Where your phone?

> INVESTIGATOR ALLDAY:  What's the number?

> THE DEFENDANT: I dial it.  You go on and dial it.  304-3243.  Now, when you want that?

> INVESTIGATOR ALLDAY:  Tomorrow.

THE DEFENDANT:  At 9 o'clock?

INVESTIGATOR ALLDAY:  Tomorrow at 9 o'clock.  All right.  Well, you got to hear the whole deal.  The whole deal, all right?  I come up with 11, okay?

THE DEFENDANT:  11,000?

INVESTIGATOR ALLDAY:  $11,000.  Plus four cookies for $3,000.  That's $14,000.  You and your partner come up with eight for a total of 22.

THE DEFENDANT:  Right.

INVESTIGATOR ALLDAY:  Y'all bring the eight and the four cookies to me and I'll have y'all a car.

THE DEFENDANT:  And $11,000?

INVESTIGATOR ALLDAY:  And $11,000 to go down south.  So you'll have 22 total.

THE DEFENDANT:  All right.  Let me hit it on the phone, I'm going to let you explain the same thing because—like you want it.

(Inaudible.)

THE DEFENDANT:  Well, it sound good to me.  Just (inaudible) at 9 o'clock in the morning?

INVESTIGATOR ALLDAY:  Yeah.

THE DEFENDANT:  Bank open at 9:00.  We'll say 10 o'clock.

INVESTIGATOR ALLDAY:  All right.  10 o'clock is fine.

THE DEFENDANT:  Hey, Chris.  Hey this is John.  Now, I know you don't like to talk on the phone.  I got my boy.  I'm sitting in the truck with him.  We talking.  All right?  I want you to hear what he got to say.  He just done said four and then he going to tell you about the car and the money.  Now, listen what he said and then shoot it back to me.

INVESTIGATOR ALLDAY:  Are you there, Man?  Pretty good.  I'm doing all right.  This is the deal.  Look, I got the money.  I can come up with eleven, all right?  I'll take four of them like you got the other day for three, so that's 14.  I'll

have a car and all that, and y'all come up with the other eight and we'll go in half. Y'all take 18 and I'll take 18.  You're getting 18 for your 8, I'm getting 18 for 11. That's what we need to do?  Yeah.  Y'all make the trip. . . . I mean, but does that sound good to you?  Okay.  Well—

THE DEFENDANT:  Let me talk back to him.

INVESTIGATOR ALLDAY:  You going to have the eight because I want to see the eight to know that y'all have that.  You going to show it to me in the morning when I show you the eleven, and I'll take the other.  All right.  All right.

You got a preference on the car?  You got a preference on the car?

THE DEFENDANT:  Yeah.

INVESTIGATOR ALLDAY: All right.  Tell me what—what—what do you want—want me to rent?  Like a Chevy Impala?  Now, they kind of small, ain't they? They full size?  All right.  Now you can do that?  All right.  All right.

Now, I'm trusting you with eleven.

THE DEFENDANT:  (Inaudible).  We don't play that.  We straight up.

INVESTIGATOR ALLDAY:  Well, I know where he lives at.  I don't know nothing about you.

THE DEFENDANT:  We straight—

INVESTIGATOR ALLDAY:  I came to your house?  I ain't never been to your house.

THE DEFENDANT:  No, he never did come out there, Chris.
. . . .
INVESTIGATOR ALLDAY:  But anyway, when do you want to do it?  And when y'all going to leave?

THE DEFENDANT:  Tomorrow.
. . . .
INVESTIGATOR ALLDAY: I don't want to come down here with $11,000.

THE DEFENDANT:  Well, we'll go to his house out there (inaudible).

INVESTIGATOR ALLDAY:  We'll talk about it tomorrow where we meet. All right?  That will work?

Your man wants to talk to you.

THE DEFENDANT:  Hello?  Okay.  All right.  All right.  I'll do that.  All right.

INVESTIGATOR ALLDAY:  What did he say?

THE DEFENDANT:  It's on.

INVESTIGATOR ALLDAY:  All right.  So y'all going to have four for me, right?

THE DEFENDANT:  Yeah.

INVESTIGATOR ALLDAY:  Okay.  Look, straight up.

THE DEFENDANT:  Yeah.
. . . .
THE DEFENDANT:  Okay.  You going to have everything like you want me to.  Okay.  Everything like you say you'll have me, we going to have.  The reason I'm trying to rush you up out of here because of what—
. . . .
THE DEFENDANT:  Because I don't want you in no trouble.
. . . .
THE DEFENDANT:  And I don't want myself in no trouble.

INVESTIGATOR ALLDAY:  All right.  So straight up tomorrow.

THE DEFENDANT:  Straight up tomorrow.  I'm going to be looking for you at 9 o'clock.
. . . .
THE DEFENDANT:  . . . You call me at 9:20.
. . . .
THE DEFENDANT:  We can do it here or we can do it out there.
. . . .
THE DEFENDANT:  . . . I'll wait for you to give me a call.

(Inaudible.)

INVESTIGATOR ALLDAY:  All right.  I'm getting out of here, I'll talk to you tomorrow.

(Conclusion of audiotape.)

(*id.* at 154–63).

Investigator Allday testified that Petitioner was subsequently arrested, and he advised Petitioner of his <u>Miranda</u> rights (*id.* at 167).  Petitioner told Allday that he met Chris in January of 2001, and began selling crack cocaine with him in April of 2001 (*id.* at 168).  Petitioner admitted that he sold over 500 grams of crack cocaine for Chris, and he and Chris had made a trip to St. Petersburg during which Chris bought five ounces of powder cocaine and brought it back to Pensacola (*id.* at 168).

Marilyn Colter, a custodian of records for the Sprint telecommunications company, testified that the subscriber to cell phone number 304-3243 is Dedrick Geter (*id.* at 189–91).

The evidence, viewed in a light most favorable to the State, was sufficient to permit a rational juror to conclude beyond a reasonable doubt that Petitioner intended that the offense of sale, purchase, or delivery of a quantity of at least 400 grams but less than 150 kilograms of cocaine would be committed, and in order to carry out that intent, Petitioner agreed with Dedrick "Chris" Geter to cause the sale, purchase, or delivery of a quantity of at least 400 grams but less than 150 kilograms of cocaine to be committed either by them, or one of them, or by some other person.  This was evidenced by Investigator Allday's testimony and the audiotapes of conversations between Petitioner, Allday, and Chris.  Since a rational trier of fact could have found guilt beyond a reasonable doubt as to the conspiracy count, this court concludes that Petitioner failed to establish that his appellate counsel acted unreasonably by failing to raise on appeal the issue of the trial court's denial of defense counsel's motion for judgment of acquittal.  Furthermore, Petitioner failed to demonstrate a reasonable probability that if appellate counsel had raised this issue on direct appeal, the appellate court would have reversed the conviction on the conspiracy count.  Therefore, Petitioner has failed to establish that the state court decision was unreasonable.

Accordingly, it is respectfully **RECOMMENDED**:

That the amended petition for writ of habeas corpus (Doc. 8) be **DENIED**.

At Pensacola, Florida, this <u>10</u><sup>th</sup> day of May 2007.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within ten (10) days after being served a copy thereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).